IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORTHEAST LAND DEVELOPMENT, LLC, | : | No. 3:08cv290 |
| **Plaintiff** | : | **(Judge Munley)** |
| **v.** | : | |
| **CITY OF SCRANTON,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court for disposition are the parties' respective motions for summary judgment (Docs. 35, 40). The motions have been briefed and are ripe for disposition.

## BACKGROUND

This case stems from a land development dispute between Plaintiff Northeast Land Development, LLC ("NE Land") and Defendant the City of Scranton ("the City"). Because the intricacies of the City of Scranton's land development process greatly inform the court's analysis, below, a synopsis of the relevant provisions is appropriate.

The first step in the land development process in the City of Scranton is the Application for Subdivision or Land Development. (Application Form for Subdivision or Land Development (Doc. 41-37); Doc. 42 ¶ ¶ 58, 59). Following the application, a developer submits a Preliminary Plan, which requires the approval of the City Planning Commission and the City Engineer. (Id.) After these approvals, a developer submits a Final Plan for approval by the Scranton City Planning Commission. (Id. ¶ 60). Finally, the developer must enter into a Development Agreement with the City of Scranton. (Id. ¶ 62).

The statutory mechanics underlying the process are as follows: The City of Scranton Subdivision and Land Development Ordinance of 1996

("Development Ordinance"), codified at Chapter 423 of the Code of Ordinances for the City of Scranton ("City Code"), prohibits land development unless the development follows the provisions of that chapter. Scranton, Pa., Code of Ordinances ("City Code") ch. 423, art. II, § 423-4(A) (1996), *available at* http://ecode360.com/?custId=SC1588 (last accessed as of the date of this opinion).  Section 423-(4)(B) requires that Final Plans be approved and recorded before any subdivision is developed.  City Code ch. 423, art. IV, § 423-4(B).  That section also requires that, in accordance with section 423-41, the City either (1) be given "adequate financial security," or (2) that any required improvements to the land be completed in advance.  City Code ch. 423, art. IX, § 423-41. Section 43(A)(1) of the Development Ordinance states:

> All applicants proposing any subdivision or land development which provides for the installation of improvements required by this chapter or any improvements or amenities which appear on the final plan shall be required to enter into a legally binding development agreement with the city prior to recording the final plan. . . .[1]

City Code ch. 423, art. IX, § 423-41(A)(1).

Thus, a developer cannot construct a subdivision before he has recorded an approved Final Plan and the City can require the developer to enter into a Development Agreement before recording his approved Final Plan.

Section 423-4(C) states that only "landowners," including equitable landowners or the landowners' agents, can apply for approval of a development plan.  City Code ch. 423, art. IV, §423-4(C).  A landowner, in turn, is defined in section 423-21 as "[t]he owner of a legal or equitable

---

[1] Section 423-43(A)(1) of the Development Ordinance also includes two exceptions to the Development Agreement requirement which are not at issue in this case.

2

interest in land, including the holder of a formal option or contract to purchase (whether or not such option or contract is subject to any condition) . . . or other person having a proprietary interest in land." CITY CODE ch. 423, art. IV, § 423-21. Similarly, an applicant is defined as "[a] landowner or developer who has filed an application for a subdivision or land development, including his/her heirs, successors and assignees." Id.

Section 423-33(F)(1) of the Development Ordinance provides that it is the Planning Commission which renders a "decision" on a Development Plan. CITY CODE ch. 423, art. VII, §423-33(F)(1). Section 423-43(B) of the Development Ordinance states:

> The development agreement shall be acceptable in legal form to the City Solicitor and shall be acceptable in content to the governing body. The city may require that a development agreement to include any of the following items, where applicable, and such additional items as are necessary to carry out this chapter:
> 1. The construction depicted on the approved plans, listed in itemized format. . . .
> 2. A work schedule. . . .
> 3. The provision of a performance guarantee for completion of required improvements. . . .
> 4. Provisions concerning the developer's responsibilities for damage to other property, including maintenance by the developer of public liability insurance for the duration of improvements construction [sic], with a hold harmless clause to protect the city from liability related to such work. A copy or other evidence of such liability coverage shall be provided to the city prior to such work.
> 5. Provisions requiring that the applicant and/or other responsible entities ensure that erosion sedimentation and stormwater management plans are complied with.
> 6. Provisions for the dedication of streets, water and sewer lines. . . .
> 7. See § 423-49 concerning the requirement for a record plan.
> 8. Provisions for the developer to re-

3

imburse the city for all reasonable engineering costs directly related to the review, construction and inspection of the proposed development and to the review and preparation of the development agreements.

9.    Provisions concerning any violations of the development agreement.

10.   Any other lawful terms which the governing body may require to carry out the provisions of this chapter.

11.   Signatures.[2]

Having surveyed the statutory context in which this case unfolds, the court presents the relevant facts. Plaintiff NE Land is a Pennsylvania Limited Liability Company with its principal place of business in Dunmore, Pennsylvania. (Pl.'s Statement of Material Facts ¶ 1 (Doc. 37)). Christopher Speicher ("Speicher") and Michael Skoff were the principal board members of NE Land. (Doc. 37 ¶ 6). Speicher was an agent of Community Initiatives Development Corporation I ("CIDC-I"), but not a member. (Def.'s Statement of Material Facts ¶ 4 (Doc. 42); Doc. 37 ¶ 5). CIDC-I is a subsidiary of Community Initiatives Development Corporation ("CIDC"). (Doc. 42 ¶ 5).

The property which led to the dispute was a piece of land– approximately 134 acres– designated as a Keystone Opportunity Zone and owned by Lackawanna Energy, Ltd. and Plum Realty, Ltd. (Agreement of Sale (Doc. 41-5); Doc. 42 ¶ ¶ 8, 9). In the late-1990s, Christopher Kelleher ("Kelleher"), as President of Lackawanna Energy, Ltd. and Plum Realty, Ltd., approached Speicher to inquire into Speicher's interest in buying and developing the land. (Doc. 42 ¶ ¶ 8, 9). Speicher originally had interest in developing the land for commercial use, but settled on residential

---

[2] The City does not contend that the City Solicitor disapproved of the legal form of the proposed Development Agreement, therefore we need not address that requirement of section 423-43(B).

development when he could not obtain a zoning variance.  (Doc. 42 ¶ ¶ 9, 10).  Tripp Keyser Partners, LLC ("Tripp Keyser"), of which Speicher was a principal, entered into an agreement of sale with Lackawanna Energy for the purchase a portion of the 134 acres, which became Phase I of the Village at Tripp Park.  (Doc. 42 ¶ 12).

Tripp Keyser obtained all of the necessary approvals for the Phase I property, at which point CIDC took over development.  (Doc. 42 ¶ 13). Tripp CDC, formed by Speicher, was given forty-two lots within Phase I as a developer's fee, as well as $500.00 for each lot sold.  (Id. ¶ ¶ 3, 17, 18). Scranton City Council members and city representatives recall dealing exclusively with Scott Speicher during Phase I's approval and development.  (Id. ¶ 21).

In 2004, NE Land bought a second portion of the land from Lackawanna Energy and Plum Realty to develop into Phase II of the Village at Tripp Park.  (Id. ¶ 25).  Phase II involved seventeen lots.  (Id. ¶ 26).   Development began on Phase II despite remaining problems with water retention, lighting, and road repair in Phase I.  (Id. ¶ 22).  The Scranton City Council expressed its concerns with Phase I to Speicher. (Id. ¶ 27). Speicher relayed those concerns to CIDC, the developer of Phase I, and CIDC's contractor.  (Speicher Dep. 46 to 47 (Doc. 41-2)).

On May 28, 2004, NE Land entered into an Agreement for the Sale of Real Estate ("Agreement of Sale") with Lackawanna Energy and Plum Realty for the Phase III parcel of the property.  (Agreement of Sale (Doc. 41-5); Doc. 42 ¶ 30).  The agreement required settlement by September 1, 2004.  (Doc. 41-5 at item 4(c)).  The agreement did not state whether or not written notice of termination was required.  (Doc. 42 ¶ 34).

The agreement was extended by a First Addendum dated September 9, 2004, which extended the closing deadline until October 1, 2004 and

contemplated three more monthly extensions in return for escalating monthly payments of $5,000.00, $7,500.00, and $10,000.00, which NE Land paid.  (Doc. 42 ¶35; Doc. 37 ¶ 10).

On October 4, 2004, NE Land submitted its Application for Subdivision or Land Development.  (Application Form for Subdivision or Land Development (Doc. 41-37); Doc. 42 ¶ 58).  As noted above, this represented NE Land's first step in the City of Scranton's land development process.

A Second Addendum to the Agreement of Sale, dated January 6, 2005, extended the closing deadline to April 30, 2005, for an additional $25,000.00, payable at the time of closing.  (Doc. 42 ¶ 36).  On April 12, 2005, NE Land, through its attorney Mark J. Conway, submitted a draft Development Agreement for Phase III to Jerry Butler, Assistant Solicitor for the City of Scranton.  (Doc. 37 ¶ 12).  George Parker, the City Engineer for the City of Scranton reviewed the Development Agreement and found it to be adequate, though he also stated that issues remained unresolved from Phase I.  (Doc. 37 ¶ 19; Parker Dep. 20, 59 (Doc. 47-2)).

Kelleher granted NE Land an oral extension on May 2, 2005, and this extension was reduced to a Third Addendum on May 4, 2005, extending the closing deadline to May 31, 2005, for another $5,000.00.  (Doc. 42 ¶¶ 37, 38).  A Fourth Addendum dated June 9, 2005, extended the closing deadline to June 30, 2005, for another $5,000.00.  (Id. ¶ 39).  A Fifth Addendum dated August 4, 2005, extended the closing deadline to August 31, 2005, for another $10,000.00, payable at closing.  (Id. ¶ 40).  Finally, on October 25, 2005, a Sixth Addendum was entered into, extending the closing until January 31, 2006, for an additional $25,000.00, payable at time of closing.  (Id. ¶ 41).

According to NE Land, the City of Scranton Planning Commission

6

approved the Final Plan for Phase III on November 20, 2005.[3] (Doc. 37 ¶ 17). On January 31, 2006, there was no closing on the Agreement of Sale between NE Land, Lackawanna Energy, and Plum Realty. (Doc. 42 ¶ 42). No metes and bounds description or response to engineering concerns had been provided. (Id.) Lackawanna Energy, through Attorney James Zipay, offered to extend, by way of addendum, the Agreement of Sale until March 1, 2006, but no such extension was made. (Doc. 37 ¶ 20).

On February 13, 2006, there was a meeting between Scranton City Councilwoman Judy Gatelli, Scranton City Solicitor Robert Farrell, Don King of the Scranton City Planner, and Michael Skoff of NE Land. (Doc. 37 ¶ 21). At this meeting, Gatelli gave Skoff a list of twelve items (the "punch list") she wanted addressed before the City Council would consider the Development Agreement for Phase III. (Id.) Gatelli informed Skoff that she would recommend tabling the resolution to approve the Development Agreement if the list was not completed. (Id. ¶ 23). The next day, February 14, 2006, Solicitor Robert Farrell forwarded a copy of the Developer's Agreement to the Scranton City Council. (Id. ¶ 25).

On February 16, 2006 a resolution to approve the Phase III Development Agreement was forwarded to the Scranton City Council. (Doc. 42 ¶ 51). The Council tabled the resolution, upon the recommendation of Judy Gatelli, because issues regarding Phase I, listed on the punch list had not been remedied. (Id. ¶ 52; Doc. 37 ¶ 26). In her deposition, Gatelli testified that, in her experience, the Development Agreement and financial security was an ineffective means of ensuring that a developer adheres to its obligations. (Gatelli Dep. 53 (Doc. 38-4)).

---

[3] The City confirmed, at oral argument, that the Final Plan was approved by the Planning Commission.

Gatelli also testified, when asked whether she believed the Scranton Code gave the Council authority to condition Development Agreement approval on fixing problems with a separate development, "No. But I don't think council has to do everything according to the Code." (Id. 67). Councilwoman Janet Evans testified similarly. (Evans Dep. 33 to 34 (Doc. 38-4)). Evans testified that she believed that Keystone Opportunity Zones amount to welfare for corporations. (Id. 12). Gatelli and Evans both believed that the Planning Commission's approval of a Final Plan is only advisory, not a final decision. (Gatelli Dep. at 47 (Doc. 38-4); Evans Dep. at 18 (Doc. 38-4)).

Speicher worked to make the necessary changes, just as he had when seeking approval of the Phase II Development Agreement. (Doc. 42 ¶ 53). Specifically, Speicher sought to have CIDC and CIDC-I remedy the Phase I deficiencies. (Id. ¶ 54). Ultimately, not all of the repairs were made and the resolution to approve the Phase III Development Agreement was never revisited by the City Council. (Id. ¶¶ 56, 57).

On April 20, 2006, at a Scranton City Council Caucus meeting, Gatelli stated that she tabled the resolution to approve the Phase III Development Agreement because of the items remaining on the punch list and complaints from residents in the Phase I section of the Village at Tripp Park. (Doc. 37 ¶ 31; Doc. 42 ¶ 52). Speicher attended the meeting and told the Council that his interpretation of the City Code gave the Council the authority to require a satisfactory Development Agreement, but that this agreement could only relate to providing financial security– not condition approval to remediation of earlier developments. (Doc. 37 ¶ 32).

On July 28, 2006, Zipay faxed Kelleher a proposed formal termination of the Agreement of Sale and all addenda. (Doc. 42 ¶ 48). In 2007, the Scranton School District filed a condemnation action against the

8

Phase III parcel, which it ultimately acquired in 2009.  (Id. ¶ 67).[4]

On February 14, 2008, NE Land filed a one-count complaint against Defendants the City of Scranton and Scranton City Council members Judy Gatelli, William Courtright, Janet Evans, Sharon Nealon Fanucci, and Robert McTiernan.  (Doc. 1).  The complaint brought claims pursuant to 42 U.S.C. § 1983 for violations of NE Land's Substantive and Procedural Due Process rights under the Fourteenth Amendment to the United States Constitution.  (Id.)

The defendants filed a motion to dismiss on March 17, 2008.  (Doc. 10).  We granted the motion with respect to the individual defendants, and they were dismissed from the case.  (Id.)  We also granted the motion with respect to NE Land's section 1983 claim for violation of NE Land's Substantive Due Process rights.  NE Land was allowed to proceed against the City of Scranton on its claim for violation of its Procedural Due Process rights.  On March 3 and 4, 2010, the plaintiff and defendant filed their respective motions for summary judgment.  (Docs. 35, 40).  On June 29,

_____

[4] The City argues that this court is bound by principles of collateral esptoppel to adopt facts found by Judge Minora in a state court action to which NE Land and the City were defendants.  (See Medallis v. Northeast Land, et al., 2003 EQ 60063 (Lacka. Co. December 4, 2008) (Minora, J.) (Doc. 41-38)).  Generally, the City argues that we must adopt the following facts: (1) that Speicher, as an agent or member of the various entities, was involved in the development of all three phases of the Village at Tripp Park; (2) that the development of the Village at Tripp Park Phases I and II increased the volume of runoff water, overwhelming other neighborhoods; and (3) that the construction of the Village at Tripp Park departed from its design in ways that exacerbated storm water impact.  Only the first fact is relevant to this motion for summary judgment, and it is not in dispute.  The second and third facts are not relevant to whether NE Land's claim for procedural due process presents a genuine issue of material fact and we decline to adopt them at this time.

2010, this court held an oral argument on the parties' motions, bringing the case to its present posture.

**JURISDICTION**

Because this case is brought pursuant to 42 U.S.C. § 1983, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**LEGAL STANDARD**

The granting of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to

10

admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**DISCUSSION**

NE Land's remaining claim alleges a procedural due process violation by the City. "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).[5] NE Land does not claim that it was deprived of any liberty interest, therefore we focus only on whether it was deprived of a protected property interest.

NE Land argues that it held equitable title to the property it wished to develop and that, by tabling its Developer's Agreement instead of voting on it, the City gave NE Land no decision to appeal, violating NE Land's right to procedural Due Process. The City responds, (1) that NE Land had no protected property interest in the approved Development Plan because its contract to purchase the land had expired while the Development Agreement was tabled and (2) that even if NE Land had such an interest, it

_____

[5] The deprivation must also have been committed by a state actor. Kelly v. Borough of Sayreville, N.J., 107 F.3d 1073, 1077 (3d Cir. 1997). The parties do not dispute, however, that the City of Scranton is a state actor.

had an adequate remedy– to deem its Development Agreement approved after ninety days of inaction and to enforce that deemed approval through a writ of mandamus in state court.  We will address each element in order.

## A. Deprivation of Protected Interest

The parties both seek summary judgment on the issue of whether NE Land had a property interest protected by the Fourteenth Amendment. "Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules. . . ." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972); see also Kelly v. Sayreville, N.J., 107 F.3d 1073, 1077 (3d Cir. 1997) ("State law creates the property rights protected by the Fourteenth Amendment.").  "A property interest subject to protection by the due process clause results from a 'legitimate claim of entitlement' created by an independent source such as state law." Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667 (3d Cir. 1991), overruled on other grounds by United Artists Theatre Circuit, Inc. v. Warrington, 316 F.3d 392 (3d Cir. 2003) (quoting Bd. of Regents, 408 U.S. at 577).  The Third Circuit has held "that an entitlement may exist for a benefit sought but not yet obtained if state law limits the exercise of discretion by the state official responsible for conferring the benefit." Midnight Sessions, Ltd., 945 F.2d at 679 (citing Winsett v. McGinnes, 617 F.2d 996, 1007 (3d Cir. 1980) (finding liberty interest in work release)).  At oral argument, the City conceded that a land developer has a protected property interest in an approved Development Plan, under normal circumstances.  The City contends, however, that NE Land did not have such an interest in their approved Development Plan because the Agreement of Sale lapsed before the Development Agreement could be approved.  Thus, we must determine whether NE

Land lost its protected property interest in its approved Development Plan when it failed to enter into a seventh addendum to extend its contract to purchase the parcel of land beyond January 31, 2006.

The City notes that the Agreement of Sale between NE Land and Lackawanna Energy and Plum Realty included a "Time of the Essence" term and, after the final addendum, required settlement by January 31, 2006. The City argues that because NE Land did not settle by that date it was no longer under contract to become the owner of the property, and therefore was an inappropriate applicant under city law. NE Land counters that it held equitable title to the Phase III parcel, through the Agreement of Sale and addendums, and therefore had a property interest in its approved Development Plan. In addition, NE Land argues that it was a proper applicant for an approved Development Plan because the "Time of the Essence" term was, alternatively, ambiguous as to requiring notice of termination, or waived through the course of performance.

The City cites <u>Wasserman v. Steinman</u>, 155 A. 302, 303 (Pa. 1931) for the proposition that "[w]here time of settlement is made the essence of the contract for sale of real estate, it still remains the essence of the contract, although a definite extension of time has been granted." However,

> even though the time fixed in an agreement for settlement is stated to be of the essence of the agreement, it may be extended by oral agreement or be waived by the conduct of the parties, and where the parties treat the agreement as in force after the expiration of the time specified for settlement it becomes indefinite as to time and neither can terminate it without reasonable notice to the other[.]

<u>Warner Co. v. MacMullen</u>, 112 A.2d 74, 77-78 (Pa. 1955) (citing <u>Hopp v. Bergdoll</u>, 131 A. 698, 699 (Pa. 1926)).

Addressing the facts here, Item 11 of the Agreement of Sale, "Default–Time of the Essence" states "[t]he time for settlement and all

13

other times referred to for the performance of any of the obligations of this Agreement are hereby agreed to be of the essence." The time of settlement was extended six times, with the last extension requiring settlement by January 31, 2006. At least the first, third, fourth, fifth, and sixth of these addendums were entered into sometime after the preceding settlement deadline had elapsed. Thus, a reasonable jury could find that the "Time of the Essence" term was not followed by either party during the course of the agreement or addenda, and that NE Land was a valid "landowner" for purposes of sections 423-4 and 21 of the Development Ordinance because of this waiver.[6] Thus, there is a genuine issue of material fact as to whether NE Land was a valid applicant under the Development Ordinance.[7] For this reason, the parties' respective motions for summary judgment will be denied.

## B. Adequacy of Procedure

Having determined that a genuine issue of material fact exists as to

---

[6] It is worth noting that section 423-4C states only that "[n]o subdivision or land development shall be **submitted** to the city for review except by the landowner. . . ." CITY CODE ch. 423, art. IV, §423-4(C) (emphasis added). Thus, for purposes of the Development Ordinance, the relevant time of inquiry into an applicant's status as a landowner is that of submission, at which point NE Land was unequivocally under contract to purchase the parcel, and therefore a landowner as defined by the Ordinance. At oral argument, the City conceded that no other provision of the Development Ordinance explicitly requires ownership throughout the approval process.

[7] Because we decide that there are genuine issues of material fact as to whether NE Land had a protected property interest in its approved Development Plan based on a theory of waiver, we do not address NE Land's alternative argument that the "Time of the Essence" term was ambiguous as to requiring written notification before termination.

whether NE Land had a protected property interest in their approved
Development Plan, we must examine whether the procedures afforded to
NE Land satisfied the Due Process Clause of the Fourteenth Amendment.
"Due process requires that a deprivation of property be preceded by notice
and opportunity for hearing appropriate to the nature of the case and the
opportunity to be heard must be at a meaningful time and in a meaningful
manner." Midnight Sessions, Ltd., 945 F.2d at 680 (citing Cleveland Board
of Education v. Loudermill, 470 U.S. 532, 542 (1985); Armstrong v. Manzo,
380 U.S. 545 (1965)) (internal quotations omitted). "It is the law in this
Circuit that a state provides adequate due process when it provides
reasonable remedies to rectify a legal error by a local administrative body."
Bello v. Walker, 840 F.2d 1124, 1128 (3d Cir. 1988) (holding that
Pennsylvania's full judicial review of a denied building permit is adequate
process) (internal quotations and citations omitted). More specifically,
"when a state 'affords a full judicial mechanism with which to challenge the
administrative decision [],' the state provides adequate due process."
Midnight Sessions, Ltd., 945 F.2d at 680 (quoting Bello v. Walker, 840 F.2d
1124, 1128 (3d Cir. 1988).

The parties agree that Pennsylvania affords a full judicial mechanism
for adverse land use decisions. See 53 PA. STAT. § 11002-A (a) ("All
appeals from all land use decisions rendered [by a Zoning Hearing Board]
shall be taken to the court of common pleas of the judicial district wherein
the land is located"). Appeal is also available in situations where no
administrative decision is made. See 53 PA. STAT. § 10508(3) ("Failure of
the governing body or agency to render a decision and communicate it to
the applicant within the time and in the manner required herein shall be
deemed an approval of the application in terms as presented. . . .").

NE Land argues, however, that it was caught in statutory and

administrative limbo– with a favorable "decision" by the Planning Commission and an unappealable tabling of its Development Agreement by the City Council.  The City responds that NE Land had adequate means of seeking review of the Council's vote tabling the agreement.  First, the City argues, NE Land could have appealed the tabling itself.  Alternatively, NE Land could have given notice that the Development Agreement was deemed approved and then file a writ of mandamus in state court to enforce the approval.

To evaluate these positions, it is useful to re-examine the statutory context under which the parties operated.  Section 423-14 of the Development Ordinance provides that "[d]ecisions of the Planning Commission may be appealed in accordance with the Pennsylvania Municipalities Planning Code, as amended."  CITY CODE ch. 423, art. II, § 423-14.   53 PA. STAT. § 10508(3) allows applicants to "deem" approval of application for a plat if no "decision" by the "governing body" within ninety days.  Section 423-33(F)(1) provides that the Planning Commission is the body which renders a "decision" on a Development Plan.  Section 423-43(A)(1) of the Development Ordinance states:

> All applicants proposing any subdivision or land development which provides for the installation of improvements required by this chapter or any improvements or amenities which appear on the final plan shall be required to enter into a legally binding development agreement with the city prior to recording the final plan. . . .

Nothing in these subsections provides for a direct appeal of a decision to table a Development Agreement.  The decision to table the resolution was made by the Council, not the Planning Commission, rendering section 423-14 inapplicable.  As we will explain below, the City's second argument also fails because there is no provision for deeming a Development Agreement approved.  Because a deemed approval is not

16

available, there is no clear legal right to enforce via a writ of mandamus.

Because deemed approvals have the potential to evade zoning laws enacted for the health and safety of the public, they are disfavored at law and "there must be an express legislative declaration of deemed approval in a statutory ordinance provision. . . ." LVGC Partners, LP v. Jackson Twp. Bd. of Supervisors, 948 A.2d 235, 237 (Pa. Commw. Ct. 2008). See, e.g., D'Amico v. Bd. of Supervisors, 526 A.2d 479 (Pa. Commw. Ct. 1987) (refusing to graft MPC's deemed approval provision onto a section of the Pennsylvania Sewage Facilities Act where that section did not explicitly provide for deemed approval of a sewage permit); Gemini Equip. Co. v. Bd. of Commissioners of Susquehanna Twp., 604 A.2d 1233 (Pa. Commw. Ct. 1992) (refusing to apply MPC's deemed approval provision onto another section of that code requiring a public hearing where the public hearing section itself did not expressly state that deemed approvals were available).[8]  Thus, we determine that for a deemed approval provision such as  53 Pa. Stat. § 10508(3) to apply, there must be an express statement by the applicable legislature.  That statement must also have been specific to the act in question.  Because there is no express statement in the City Code specifying that deemed approvals are available where the City Council fails to vote on a developer's Development Agreement, we determine that no such remedy was available to NE Land in this case.

_____

[8] We are not aware of any opinion of the Supreme Court of Pennsylvania addressing whether 53 Pa. Stat. § 10508(3) applies to Section 423-43 of the City Code.  Therefore, we endeavor to predict how that court would rule if presented with the issue.  Nationwide v. Mutual Ins. Co., 230 F.3d 634, 637 (3d Cir. 2000).  In so doing, we must examine the opinions of the lower state courts, and we cannot disregard them unless we are convinced by other persuasive data that the highest court would rule otherwise.  Id.

Furthermore, the procedural solution suggested by the City– a writ of mandamus– would not be appropriate in this context, absent an express provision for a deemed approval of a Development Agreement. "Mandamus is the appropriate mechanism to obtain recognition of a deemed approval of a proposed land development plan. . . ." Philomeno & Salamone v. Bd. of Sup'rs of Upper Merion Twp., 966 A.2d 1109, 1110 (Pa. 2009) (citing Lehigh Asphalt Paving & Construction Co. v. East Penn Twp., 830 A.2d 1063, 1070 (Pa. Commw. Ct. 2003)). However, "[m]andamus is an extraordinary writ and is a remedy used to compel performance of a ministerial act or a mandatory duty." Council of Philadelphia v. Street, 856 A.2d 893, 896 (Pa. Commw. Ct. 2004) (quoting Borough of Plum v. Tresco, 606 A.2d 951, 953 (Pa. 1992))." "In order to obtain a writ of mandamus, the [plaintiff] must demonstrate: (1) a clear legal right for the performance of the ministerial act or mandatory duty, (2) a corresponding duty in the [defendant] to perform the ministerial act or mandatory duty, and (3) the absence of any other appropriate or adequate remedy." Id. (citing Equitable Gas Co. v. City of Pittsburgh, 488 A.2d 270, 272 (Pa. 1985); Advantage Dev., Inc. v. Bd. of Supervisors, 743 A.2d 1008, 1011 (Pa. Commw. 2000)). "Mandamus can never be invoked in a doubtful case." Equitable Gas Co., 488 A.2d at 272 (quoting Commonwealth ex rel. McLaughlin v. Erie County, 100 A.2d 601 (Pa. 1953)). "To succeed in an action of mandamus, the plaintiff must show an immediate, specific, well defined and complete legal right to the thing demanded." Id. at 273 (citing Purcell v. City of Altoona, 72 A.2d 92 (Pa. 1950)).

Because neither the Development Ordinance nor the MPC contain an express provision to deem approved a Development Agreement, as explained above, a writ of mandamus is inappropriate. In essence,

because there is no provision for the deemed approval at issue here, there is no clear duty in the City Council. The City's position is belied by depositions of its council-members, described above, indicating that they felt they were under no compulsion of the City Code to approve NE Land's Development Agreement, and that they were free to condition its approval in their complete discretion, regardless of whether the City Code contemplated that or not.

Accordingly, we will grant NE Land's motion for summary judgment on the issue of whether the procedures afforded to it were adequate. Because this issue presents only a question of law, which we have resolved, there is no genuine issue of material fact requiring submission to a jury.

**CONCLUSION**

For the reasons stated above, the City's motion for summary judgment will be denied. NE Land's motion for summary judgment will be denied with respect to whether it had a protected property interest in an approved Development Agreement and granted with respect to whether the procedures afforded to it were adequate. An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**NORTHEAST LAND DEVELOPMENT, LLC,**

    **Plaintiff**

    **v.**

**CITY OF SCRANTON,**

    **Defendant**

:
:
:
:
:
:
:
:
:
:
:
:

**No. 3:08cv290**

**(Judge Munley)**

## ORDER

AND NOW, to wit, this __27th__ day of July 2010, upon consideration of the parties' motions for summary judgment (Docs. 35, 40), **IT IS HEREBY ORDERED**:

1.    That Defendant City of Scranton's motion is **DENIED**, and

2.    That Plaintiff NE Land's motion for summary judgment will be **DENIED** with respect to whether it had a protected property interest in an approved Development Agreement and **GRANTED** with respect to whether the procedures afforded to it were adequate

**BY THE COURT:**


 **s/ James M. Munley**

**JUDGE JAMES M. MUNLEY**
**United States District Court**