IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NORTHEAST LAND DEVELOPMENT, LLC   :
   :
       Plaintiff   :
   :
   v.   :   **3:08-cv-0290**
   :   **(JUDGE MARIANI)**
CITY OF SCRANTON, et al.   :
   :
       Defendants   :

## MEMORANDUM OPINION

## I.   PROCEDURAL HISTORY

This matter has its genesis in a land development project in the City of

Scranton, and involves a decision by the Scranton City Council to table a resolution

authorizing the project after it had been approved by the City Planning Commission

and City Engineer. On February 14, 2008, Plaintiff Northeast Land Development,

LLC, ("Northeast") brought suit against the City of Scranton and the five members of

the City Council of the City of Scranton, Judy Gatelli, William Courtright, Janet

Evans, Sherry Nealon Fanucci and Robert McTiernan. (Doc. 1.) Count I of the

Complaint alleged, *inter alia*, that Northeast entered into an Agreement of Sale with

Lackawanna Energy, Ltd. and Plum Realty, Ltd. for the purchase of a 25 acre parcel

of land in the City of Scranton which was designated as a Keystone Opportunity

Zone. (*Id.* ¶ 12.) The Complaint further alleges that Northeast "submitted to the City

of Scranton for approval a Subdivision Plan for the above-referenced real property

which was designated as the Village at Tripp Park Phase III." (*Id.* ¶ 13.) Northeast

further alleged that the "Village at Tripp Park Phase III was located adjacent to the

The Village at Tripp Park Phase II which was also developed by Northeast Land

Development, LLC and the The Village at Tripp Park Phase I which was developed

by CIDC 1, LLC, which was a subsidiary of Community Initiatives Development

Corporation." (*Id.* ¶ 14.) Northeast's Complaint further alleges that "a resolution was

introduced before the City of Scranton Council which would authorize the Mayor and

appropriate City Officials to enter into a Developer's Agreement with Plaintiff . . . for

approval of The Village at Tripp Park Phase III." (*Id.* ¶ 15.) The Complaint further

alleges that the resolution to authorize the Mayor and other appropriate City Officials

to enter into the Developer's Agreement with Northeast was tabled by the Scranton

City Council as a consequence of which Northeast was unable to close on the

purchase of the subject property. (*Id.* ¶ 19.) Plaintiff then alleged that the City of

Scranton and the Defendant City of Scranton Council members acted "in an

arbitrary, capricious and irrational manner, in order to coerce the plaintiff, Northeast

Land Development, LLC, to perform a punch list of items for The Village at Tripp

Park Phase I." (*Id.* ¶ 21.) By this and other conduct, Plaintiff alleged that the City of

Scranton and the members of the Scranton City Council "acted individually and in

concert with each other and in an arbitrary, capricious and irrational manner and

precluded the Plaintiff's rightful use of its property in profound violation of Plaintiff's

2

procedural and substantive due process rights pursuant to the Fourteenth

Amendment and 42 U.S.C. § 1983." (Id. ¶ 25.)

On November 21, 2008, this Court, by the Hon. James M. Munley, granted in

part and denied in part the Defendants' Motion to Dismiss. (Doc. 16.) The

Defendants' Motion to Dismiss was granted with respect to Defendants Gatelli,

Courtright, Evans, Fanucci and McTiernan, the members of the Scranton City

Council, and they were dismissed from the case. Further, Judge Munley granted the

Defendants' Motion to Dismiss Plaintiff's substantive due process claim. As a result,

only the Plaintiff's claim for a denial of procedural due process by the City of

Scranton remained at issue. In dismissing Plaintiff's claims against the individual

City Council Member Defendants, the Court wrote:

> the defendants argue that the individual defendants should be
> dismissed from the case because they are entitled to either legislative
> or quasi-judicial immunity for their actions. The Supreme Court has
> found that 'local legislators are . . . absolutely immune from suit under
> § 1983 for their legislative activities.' Bogan v. Scott-Harris, 523 U.S.
> 44, 49 (1998). This immunity applies 'to all actions taken "in the
> sphere of legitimate legislative activity."' Id. at (quoting Tenney v.
> Brandhove, 341 U.S. 367, 376 (1951)). "Whether an act is legislative
> turns on the nature of the act, rather than on the motive or intent of the
> official performing it." Id. at 54. The Court has found that "acts of
> voting for an ordinance [are], in form, quintessentially legislative." Id.
> at 55.
>
> Though Plaintiff complains about the motivation behind the individual
> defendants' actions – their animosity to certain forms of development –
> its complaint is grounded in the action that defendants took in tabling
> the motion to approve the development plan. Since voting on the
> development plan – or choosing not to vote on that plan – is the sort of

3

act that the Supreme Court has found "in form quintessentially legislative," this Court finds that the individual defendants are absolutely immune from all claims against them in this case. *See Baraka v. McGreevey*, 481 F.3d 187, 196 (3rd Cir. 2007) (finding that "activities by legislators that directly affect drafting, introducing, debating, passing or rejecting legislation, are 'an integral part of the deliberative and communicative processes,' and are properly characterized as legislative, not political patronage." (quoting *United States v. Bruster*, 408 U.S. 501, 512 (1972)). The Court will therefore grant the Motion to Dismiss Defendants Gatelli, Courtright, Evans, Fanucci and McTiernan. (Mem. Op. Doc. 16, pgs. 10-11).

Thereafter, Plaintiff and Defendants filed cross motions for summary judgment. (Docs. 35 and 40.) By Memorandum and Order entered July 27, 2010 (Doc. 59), Judge Munley denied the City's Motion for Summary Judgment which asserted that Northeast Land had no property interest which would give rise to a claim for violation of procedural due process and which asserted that the procedures afforded to Northeast were adequate. Judge Munley denied Northeast's Motion for Summary Judgment as to whether it had a protected property interest in an approved development agreement, finding that there were "genuine issues of material fact as to whether NE Land was a valid applicant under the Development Ordinance." (Doc. 59, at 14.) The Court granted, however, Northeast's Motion for Summary Judgment with respect to whether the procedures afforded to it were "adequate." (*Id.* at 19.)

The issue of whether the actions of Scranton City Council, in tabling the resolution authorizing the Mayor of the City to enter into a Development Agreement

4

with Northeast, constituted legislative action to which the protections of procedural due process would not apply, was not raised by Northeast or the City of Scranton in their respective motions for summary judgment. Nor did the City raise this issue in its motion for reconsideration of Judge Munley's Order (Doc. 60) which was denied on February 7, 2011. (Doc. 66.)

Then on April 4, 2011, Judge Munley, with the agreement of counsel, entered an Order staying this case "pending the resolution of the related declaratory judgment action in *City of Scranton v. Indian Harbor Ins. Co.*, No. 3:11-cv-529." (Doc. 82.)

On November 14, 2011, by Verbal Order, this case was reassigned to me. By Order dated December 19, 2011, (Doc. 85) the Order staying this case was continued pending resolution of the *City of Scranton v. Indian Harbor Ins.* case which had likewise been reassigned to me.

By Order dated September 28, 2012 issued in the *City of Scranton v. Indian Harbor Ins. Co.* case, I granted the City of Scranton's Motion for Summary Judgment insofar as it sought an Order requiring Indian Harbor to defend it in the *Northeast Land Development, LLC v. City of Scranton* proceeding. The City's Motion for Summary Judgment insofar as it sought an Order that Indian Harbor had an obligation to provide indemnity coverage was denied without prejudice. (Doc. 37.)

Thereafter, in the instant case, I issued an Order dated October 2, 2012 (Doc.

86) wherein the stay imposed by the Orders of April 4, 2011 (Doc. 82) and

December 19, 2011 (Doc. 85) were lifted and the Clerk was directed to reopen this

case. Further, my Order provided:

> within thirty days of this Order, viz., on or before November 2,
> 2012, Plaintiff and Defendant shall each submit a Memorandum
> of Law on the issue of whether the decision by the Scranton
> City Council to table a resolution authorizing the Mayor to enter
> into a Development Agreement was a legislative or quasi-
> legislative act, and if so, whether Plaintiff is entitled to a
> constitutional right of procedural due process in connection with
> the Scranton City Council's decision.

(Order, Doc. 86, at 1.)

The Order provided for the submission of reply memoranda by either party.

Northeast and the City of Scranton each submitted a Memorandum of Law (Docs. 87

and 88) as well as a Reply Brief by Plaintiff and a response by the City. (Docs. 89

and 90.) Thereafter, in accordance with the Order of this Court (Doc. 93) oral

argument was held before me on January 11, 2013. For the reasons that follow,

summary judgment will be entered in favor of the City of Scranton pursuant to FED.

R. CIV. P. 56(f)(1)(2) and (3) because the action of the Scranton City Council in

tabling a resolution which would have authorized the Mayor of the City to enter into a

Development Agreement with Northeast constitutes legislative action as to which no

procedural due process rights appertain.

6

## II.   STATEMENT OF UNDISPUTED FACTS

The following statement of facts is excerpted from the summary judgment

opinion of Judge James M. Munley, (Doc. 59) issued in this case on July 27, 2010,

which denied summary judgment to the City of Scranton and which granted in part

and denied in part Northeast's Motion for Summary Judgment:

> The first step in the land development process in the City of Scranton
> is the Application for Subdivision or Land Development. (Application
> Form for Subdivision or Land Development (Doc. 41-37); Doc. 42 ¶¶
> 58, 59). Following the application, a developer submits a Preliminary
> Plan, which requires the approval of the City Planning Commission
> and the City Engineer. (Id.) After these approvals, a developer submits
> a Final Plan for approval by the Scranton City Planning Commission.
> (Id. ¶ 60). Finally, the developer must enter into a Development
> Agreement with the City of Scranton. (Id. ¶ 62).
>
> The statutory mechanics underlying the process are as follows: The
> City of Scranton Subdivision and Land Development Ordinance of
> 1996 ("Development Ordinance"), codified at Chapter 423 of the Code
> of Ordinances for the City of Scranton ("City Code"), prohibits land
> development unless the development follows the provisions of that
> chapter. Scranton, Pa., Code of Ordinances ("City Code")) ch. 423, art.
> II,     §     423-4(A)     (1996),     *available*     *at*     http://ecode
> 360.com/?custId=SC1588 (last accessed as of the date of this
> opinion). Section 423-(4)(B) requires that Final Plans be approved and
> recorded before any subdivision is developed. City Code ch. 423, art.
> IV, § 423-4(B). That section also requires that, in accordance with
> section 423-41, the City either (1) be given "adequate financial
> security," or (2) that any required improvements to the land be
> completed in advance. City Code ch. 423, art. IX, § 423-41. Section
> 43(A)(1) of the Development Ordinance states:
>
>> All applicants proposing any subdivision or land
>> development which provides for the installation of
>> improvements required by this chapter or any
>> improvements or amenities which appear on the final

7

> plan shall be required to enter into a legally binding development agreement with the city prior to recording the final plan....

City Code ch. 423, art. IX, § 423-41(A)(1).

Thus, a developer cannot construct a subdivision before he has recorded an approved Final Plan and the City can require the developer to enter into a Development Agreement before recording his approved Final Plan.

Section 423-4(C) states that only "landowners," including equitable landowners or the landowners' agents, can apply for approval of a development plan. City Code ch. 423, art. IV, § 423-4(C). A landowner, in turn, is defined in section 423-21 as "[t]he owner of a legal or equitable interest in land, including the holder of a formal option or contract to purchase (whether or not such option or contract is subject to any condition) ... or other person having a proprietary interest in land." City Code ch. 423, art. IV, § 423-21. Similarly, an applicant is defined as "[a] landowner or developer who has filed an application for a subdivision or land development, including his/her heirs, successors and assignees." *Id.*

Section 423-33(F)(1) of the Development Ordinance provides that it is the Planning Commission which renders a "decision" on a Development Plan. City Code ch. 423, art. VII, § 423-33(F)(1). Section 423-43(B) of the Development Ordinance states:

> The development agreement shall be acceptable in legal form to the City Solicitor and shall be acceptable in content to the governing body. The city may require that a development agreement to include any of the following items, where applicable, and such additional items as are necessary to carry out this chapter:
>
> 1. The construction depicted on the approved plans, listed in itemized format....
>
> 2. A work schedule....
>
> 3. The provision of a performance guarantee for completion of required improvements....

4. Provisions concerning the developer's responsibilities for damage to other property, including maintenance by the developer of public liability insurance for the duration of improvements construction [sic], with a hold harmless clause to protect the city from liability related to such work. A copy or other evidence of such liability coverage shall be provided to the city prior to such work.

5. Provisions requiring that the applicant and/or other responsible entities ensure that erosion sedimentation and stormwater management plans are complied with.

6. Provisions for the dedication of streets, water and sewer lines....

7. See § 423-49 concerning the requirement for a record-plan.

8. Provisions for the developer to reimburse the city for all reasonable engineering costs directly related to the review, construction and inspection of the proposed development and to the review and preparation of the development agreements.

9. Provisions concerning any violations of the development agreement.

10. Any other lawful terms which the governing body may require to carry out the provisions of this chapter.

11. Signatures.

Having surveyed the statutory context in which this case unfolds, the court presents the relevant facts. Plaintiff NE Land is a Pennsylvania Limited Liability Company with its principal place of business in Dunmore, Pennsylvania. (Pl.'s Statement of Material Facts ¶ 1 (Doc. 37)). Christopher Speicher ("Speicher") and Michael Skoff were the principal board members of NE Land. (Doc. 37 ¶ 6). Speicher was an agent of Community Initiatives Development Corporation I ("CIDC-I"), but not a member. (Def.'s Statement of Material Facts ¶ 4 (Doc. 42); Doc. 37 ¶ 5). CIDC-I is a subsidiary of Community Initiatives Development Corporation ("CIDC"). (Doc. 42 ¶ 5).

The property which led to the dispute was a piece of land-approximately 134 acres-designated as a Keystone Opportunity Zone and owned by Lackawanna Energy, Ltd. and Plum Realty, Ltd. (Agreement of Sale (Doc. 41-5); Doc. 42 ¶¶ 8, 9). In the late-1990s, Christopher Kelleher ("Kelleher"), as President of Lackawanna Energy, Ltd. and Plum Realty, Ltd., approached Speicher to inquire into Speicher's interest in buying and developing the land. (Doc. 42 ¶¶ 8, 9). Speicher originally had interest in developing the land for commercial use, but settled on residential development when he could not obtain a zoning variance. (Doc. 42 ¶¶ 9, 10). Tripp Keyser Partners, LLC ("Tripp Keyser"), of which Speicher was a principal, entered into an agreement of sale with Lackawanna Energy for the purchase a portion of the 134 acres, which became Phase I of the Village at Tripp Park. (Doc. 42 ¶ 12).

Tripp Keyser obtained all of the necessary approvals for the Phase I property, at which point CIDC took over development. (Doc. 42 ¶ 13). Tripp CDC, formed by Speicher, was given forty-two lots within Phase I as a developer's fee, as well as $500.00 for each lot sold. (Id. ¶¶ 3, 17, 18). Scranton City Council members and city representatives recall dealing exclusively with Scott Speicher during Phase I's approval and development. (Id. ¶ 21).

In 2004, NE Land bought a second portion of the land from Lackawanna Energy and Plum Realty to develop into Phase II of the Village at Tripp Park. (Id. ¶ 25). Phase II involved seventeen lots. (Id. ¶ 26). Development began on Phase II despite remaining problems with water retention, lighting, and road repair in Phase I. (Id. ¶ 22). The Scranton City Council expressed its concerns with Phase I to Speicher. (Id. ¶ 27). Speicher relayed those concerns to CIDC, the developer of Phase I, and CIDC's contractor. (Speicher Dep. 46 to 47 (Doc. 41-2)).

On May 28, 2004, NE Land entered into an Agreement for the Sale of Real Estate ("Agreement of Sale") with Lackawanna Energy and Plum Realty for the Phase III parcel of the property. (Agreement of Sale (Doc. 41-5); Doc. 42 ¶ 30). The agreement required settlement by September 1, 2004. (Doc. 41-5 at item 4(c)). The agreement did not state whether or not written notice of termination was required. (Doc. 42 ¶ 34).

10

The agreement was extended by a First Addendum dated September 9, 2004, which extended the closing deadline until October 1, 2004 and contemplated three more monthly extensions in return for escalating monthly payments of $5,000.00, $7,500.00, and $10,000.00, which NE Land paid. (Doc. 42 ¶ 35; Doc. 37 ¶ 10).

On October 4, 2004, NE Land submitted its Application for Subdivision or Land Development. (Application Form for Subdivision or Land Development (Doc. 41-37); Doc. 42 ¶ 58). As noted above, this represented NE Land's first step in the City of Scranton's land development process.

A Second Addendum to the Agreement of Sale, dated January 6, 2005, extended the closing deadline to April 30, 2005, for an additional $25,000.00, payable at the time of closing. (Doc. 42 ¶ 36). On April 12, 2005, NE Land, through its attorney Mark J. Conway, submitted a draft Development Agreement for Phase III to Jerry Butler, Assistant Solicitor for the City of Scranton. (Doc. 37 ¶ 12). George Parker, the City Engineer for the City of Scranton reviewed the Development Agreement and found it to be adequate, though he also stated that issues remained unresolved from Phase I. (Doc. 37 ¶ 19; Parker Dep. 20, 59 (Doc. 47-2)).

Kelleher granted NE Land an oral extension on May 2, 2005, and this extension was reduced to a Third Addendum on May 4, 2005, extending the closing deadline to May 31, 2005, for another $5,000.00. (Doc. 42 ¶¶ 37, 38). A Fourth Addendum dated June 9, 2005, extended the closing deadline to June 30, 2005, for another $5,000.00. (Id. ¶ 39). A Fifth Addendum dated August 4, 2005, extended the closing deadline to August 31, 2005, for another $10,000.00, payable at closing. (Id. ¶ 40). Finally, on October 25, 2005, a Sixth Addendum was entered into, extending the closing until January 31, 2006, for an additional $25,000.00, payable at time of closing. (Id. ¶ 41).

According to NE Land, the City of Scranton Planning Commission approved the Final Plan for Phase III on November 20, 2005. (Doc. 37 ¶ 17). On January 31, 2006, there was no closing on the Agreement of Sale between NE Land, Lackawanna Energy, and Plum Realty. (Doc.

42 ¶ 42). No metes and bounds description or response to engineering concerns had been provided. (*Id.*) Lackawanna Energy, through Attorney James Zipay, offered to extend, by way of addendum, the Agreement of Sale until March 1, 2006, but no such extension was made. (Doc. 37 ¶ 20).

On February 13, 2006, there was a meeting between Scranton City Councilwoman Judy Gatelli, Scranton City Solicitor Robert Farrell, Don King of the Scranton City Planner, and Michael Skoff of NE Land. (Doc. 37 ¶ 21). At this meeting, Gatelli gave Skoff a list of twelve items (the "punch list") she wanted addressed before the City Council would consider the Development Agreement for Phase III. (*Id.*) Gatelli informed Skoff that she would recommend tabling the resolution to approve the Development Agreement if the list was not completed. (*Id.* ¶ 23). The next day, February 14, 2006, Solicitor Robert Farrell forwarded a copy of the Developer's Agreement to the Scranton City Council. (*Id.* ¶ 25).

On February 16, 2006 a resolution to approve the Phase III Development Agreement was forwarded to the Scranton City Council. (Doc. 42 ¶ 51). The Council tabled the resolution, upon the recommendation of Judy Gatelli, because issues regarding Phase I, listed on the punch list had not been remedied. (*Id.* ¶ 52; Doc. 37 ¶ 26). In her deposition, Gatelli testified that, in her experience, the Development Agreement and financial security was an ineffective means of ensuring that a developer adheres to its obligations. (Gatelli Dep. 53 (Doc. 38-4)). Gatelli also testified, when asked whether she believed the Scranton Code gave the Council authority to condition Development Agreement approval on fixing problems with a separate development, "No. But I don't think council has to do everything according to the Code." (*Id.* 67). Councilwoman Janet Evans testified similarly. (Evans Dep. 33 to 34 (Doc. 38-4)). Evans testified that she believed that Keystone Opportunity Zones amount to welfare for corporations. (*Id.* 12). Gatelli and Evans both believed that the Planning Commission's approval of a Final Plan is only advisory, not a final decision. (Gatelli Dep. at 47 (Doc. 38-4); Evans Dep. at 18 (Doc. 38-4)).

Speicher worked to make the necessary changes, just as he had when seeking approval of the Phase II Development Agreement. (Doc. 42 ¶

53). Specifically, Speicher sought to have CIDC and CIDC-I remedy the Phase I deficiencies. (*Id.* ¶ 54). Ultimately, not all of the repairs were made and the resolution to approve the Phase I II Development Agreement was never revisited by the City Council. (*Id.* ¶¶ 56, 57).

On April 20, 2006, at a Scranton City Council Caucus meeting, Gatelli stated that she tabled the resolution to approve the Phase III Development Agreement because of the items remaining on the punch list and complaints from residents in the Phase I section of the Village at Tripp Park. (Doc. 37 ¶ 31; Doc. 42 ¶ 52). Speicher attended the meeting and told the Council that his interpretation of the City Code gave the Council the authority to require a satisfactory Development Agreement, but that this agreement could only relate to providing financial security-not condition approval to remediation of earlier developments. (Doc. 37 ¶ 32).

On July 28, 2006, Zipay faxed Kelleher a proposed formal termination of the Agreement of Sale and all addenda. (Doc. 42 ¶ 48). In 2007, the Scranton School District filed a condemnation action against the Phase III parcel, which it ultimately acquired in 2009. (*Id.* ¶ 67).

On February 14, 2008, NE Land filed a one-count complaint against Defendants the City of Scranton and Scranton City Council members Judy Gatelli, William Courtright, Janet Evans, Sharon Nealon Fanucci, and Robert McTiernan. (Doc. 1). The complaint brought claims pursuant to 42 U.S.C. § 1983 for violations of NE Land's Substantive and Procedural Due Process rights under the Fourteenth Amendment to the United States Constitution. (*Id.*)

As the procedural history makes clear, the issue of whether the decision by

the Scranton City Council to table a resolution authorizing the Mayor to enter into a

Development Agreement with Northeast was a legislative or quasi-legislative act was

raised by this Court by its Order dated October 2, 2012. (Doc. 86.) "While district

courts must be careful not to create the impression that they are taking an advocacy

position on a particular issue, they are not required to ignore contractual provisions

13

or applicable law." *Southern Illinois Riverboat Casino Cruises, Inc. v. Triangle Insulation and Sheetmetal Company*, 302 F.3d 667, 677 (7th Cir. 2002). Once the issue of whether the Scranton City Council's decision to table the resolution was raised, I was required to give the parties a "meaningful opportunity to address the question before granting . . . summary judgment on that basis." *Id.* The underlying reason for the necessity of granting the parties a "meaningful opportunity" to address a question raised by the Court were stated by the Court in *Southern Illinois* as follows:

> (1) they [sua sponte dismissals] often conflict with the traditional adversarial precepts of our system of justice by tending to make the District Court seem like proponent of one side as opposed to a neutral decision-maker; (2) they may prejudice plaintiffs by depriving them of the opportunity to amend their complaint or to argue against dismissal; and (3) they tend to defeat the very purpose they are designed to serve – judicial efficiency. *Id.* at 678.

> Therefore, as a general rule, 'a district court lacks the power to grant summary judgment sua sponte unless the party against whom summary judgment was entered had (1) proper notice that the District Court was considering entering summary judgment, and (2) a fair opportunity to present evidence in opposition to the court's entry of summary judgment.

*Southern Illinois*, 302 F.3d at 677.

In this case proper notice was given by my Order of October 2, 2012 (Doc. 86) wherein the parties were directed to submit a Memorandum of Law "on the issue of whether the decision for the Scranton City Council to table a resolution authorizing the Mayor to enter into a Development Agreement was a legislative or quasi-

14

legislative act, and if so, whether Plaintiff is entitled to a constitutional right of procedural due process in connection with the Scranton City Council's decision."

Thereafter, each party submitted a memorandum in support of its position as well as supplemental memoranda in reply and in further support of their position. Further, the parties presented oral argument to the Court which was preceded by the Court's statement to counsel that "the issue here today is whether the City's action deciding to table the resolution that would have authorized the Mayor to enter into the Development Agreement with Northeast Land Development LLC was a legislative or quasi-legislative action or alternatively whether it is or was administrative adjudication to which the normal procedural due process agreement of our Constitution would have applied." (Tr. Pgs. 1-2.)

Rule 56(f)(3) specifically authorizes summary judgment on the Court's initiative provided that the Court (1) gives notice and a reasonable time to respond; and (2) identifies for the parties material facts that may not be genuinely in dispute. These requirements were met and this matter is now properly before the Court under Rule 56(f).

## DISCUSSION

In order for this matter to proceed to trial, the Court must determine whether the Scranton City Council's tabling of the resolution to approve Plaintiff's

15

Development Agreement for Phase III was legislative action. If the act of tabling the resolution constituted legislative activity, then the suit must be dismissed.

"[T]he protections of procedural due process do not extend to legislative actions." *Rogin v. Bensalem Twp.*, 616 F.2d 680, 693 (3d Cir. 1980). "The act of legislating necessarily entails political trading, compromise, and ad hoc decision making which, in the aggregate, produce policies that at least approximate a fair and equitable distribution of social resources and obligations." *Id.* at 693. "Where a rule of conduct applies to more than a few people, it is legislative action and the due process clause does not apply absent an indication that the legislative process treats an entire class of people inequitably." *Mera v. Lohman*, No. 00-1507, 2002 WL 511561, at \*3 (M.D. Pa. Apr. 4, 2002). In *Acierno v. Cloutier*, 40 F.3d 597 (3d Cir. 1994), however, the Third Circuit made clear that the number of people to whom the rule applies does not end the inquiry and the fact that legislative action is concentrated upon a single individual or entity is a substantial, but not a dispositive, factor to be considered in the analysis. *See id.* at 611. "[W]e did not intend this consideration as a bright-line rule which automatically overrides other important indications that an action is substantively legislative in character." *Id.* at 612. "Rather, we intended this consideration as a factor that is usually important but may not be dispositive of the administrative/legislative outcome." *Id.*

16

Legislative activity does not entitle an aggrieved property owner to procedural

due process. See 75 Acres, LLC v. Miami-Dade County, Florida, 338 F.3d 1288,

1294 (11th Cir. 2003); see also Smith v. Jefferson County Bd. of Sch. Com'rs, 641

F.3d 197, 217 (6th Cir. 2011)("the legislative process provides all the process that is

constitutionally due" when an alleged injury is the result of a legislative act).

Adjudicative acts, on the other hand, require the provision of procedural due

process. See 75 Acres, 338 F.3d at 1294-95. An act is "adjudicatory" when the

decision "require[s] factual findings on the particular status of a particular individual,"

while legislative decisions are those that "rest on more general findings requiring

analysis and evaluation of factors not uniquely related to any specific individual."

Powelton Civic Home Owners Ass'n v. H.U.D., 284 F. Supp. 809, 829 (E.D. Pa.

1968).

In the present matter, the Scranton City Ordinance under which the City

Council acted is "Chapter 423: Subdivision and Land Development." (See

Development Ordinance, Doc. 41, Exh. 35.) Under this ordinance, prospective

developers must undergo a multi-step review process before the Scranton City

Council may consider enacting a resolution authorizing the Mayor to enter into a

Development Agreement on behalf of the City. The ordinance can require a

Development Agreement to contain "provisions concerning the developer's

responsibilities for damage to other property." (See id. at § 423-43(B)(4).) Further,

17

the City Council can require a Development Agreement to contain "[p]rovisions requiring that the applicant . . . ensure that erosion, sedimentation and stormwater management plans are complied with." (*See id.* at § 423-43(B)(5).) The City Council can also require a Development Agreement to include "[a]ny other lawful terms which the governing body may require to carry out the provision of this chapter." (*See id.* at § 423-43(B)(10).)

At the outset, I note that Judge Munley's opinion dismissing the individual City Council Member Defendants at an earlier stage in this matter held that "voting on a development plan – or choosing not to vote on that plan – is the sort of act that the Supreme Court has found 'in form, quintessentially legislative.'" (*See* Judge Munley Dismissal Opinion, Doc.16 at 10.) "[A]ctivities by legislators that directly affect drafting, introducing, debating, passing or rejecting legislation, are 'an integral part of the deliberative and communicative processes,' and are properly characterized as legislative, not political patronage." *Baraka v. McGreevey,* 481 F.3d 187, 196 (3d Cir. 2007)(quoting *United States v. Brewster,* 408 U.S. 501, 512 (1972)). The individuals dismissed by Judge Munley on the grounds that their actions constituted legislative activities composed the entire Scranton City Council. "Indeed, a suit against elected officials in their official capacity is functionally a suit against the government entity." *Acierno,* 40 F.3d at 608. The dismissal of the individual Council Member Defendants on the ground that they were engaged in legislative activity

18

when they tabled the Development Agreement, while simultaneously permitting the very same claim to move forward against the municipality on whose behalf they acted presents an untenable and irreconcilable application of the governing case law. The actions of the Scranton City Council are co-extensive with the official actions of its members; thus, if its members acted in a legislative capacity, the unavoidable conclusion that follows is that, as a body, the Scranton City Council engaged in legislative action in this case.

Further, the Court notes that the ordinance in question specifically provides a decisive role for the Scranton City Council which requires the exercise of legislative discretion. It is clear from the text of the ordinance that the City Council has certain specified powers which are reserved for itself—namely, the ability to determine whether the city will enter into development agreements after all other preliminary prerequisites are met:

> The development agreement shall be acceptable in legal form to the City Solicitor and shall be acceptable in content to the governing body. The city may require that a development agreement include [certain specified] items, where applicable, and such additional items as are necessary to carry out this chapter.

*Development Ordinance* § 423-43(B), Doc. 41, Exh. 36.

To hold that the Scranton City Council has only a perfunctory role in the approval process, as argued by Plaintiff[1], a Court would be required to construe the Development Ordinance in a manner that ignores its plain text. Courts are bound to give full meaning to the text of statutes so as not to render any portion superfluous. *See Rosenberg v. XM Ventures*, 247 F.3d 137, 141 (3d Cir. 2001). This admonition applies here and the Court will not eliminate the textually assigned role of the Scranton City Council with regard to its decisions to table, reject or authorize agreements to develop unimproved real estate within the City.

The City Council's role in enacting or declining to enact a resolution authorizing the Mayor of the City to enter into the Development Agreement in question requires the exercise of the Council's legislative authority and, as such, its decision to table the resolution authorizing the Development Agreement did not implicate the protections of procedural due process. *Rogan v. Bensalem Twp., supra,* at 693.

Plaintiff contends, however, that the action of the Scranton City Council was targeted at Northeast Land Development, and is therefore too narrowly focused to

---

[1] At oral argument in this case, the Court and plaintiff's counsel had the following exchange:

The Court: What discretion, in your mind, what discretion did the City Council have, once that agreement came to them? Did they have any discretion?
Mr. Phillips: None.
The Court: In your view, there is none?
Mr. Phillips: None.
(Transcript of Oral Argument at 6.)

20

constitute legislative activity. Considering the undisputed facts of this case, Plaintiff's argument is misplaced.

Plaintiff argues that "[t]o determine whether actions are to be regarded as legislative for immunity purposes, action must be 'substantially' legislative, which requires that it involve policy-making or line-drawing decisions and action must be 'procedurally' legislative, which requires that it be undertaken through established legislative procedures." (See Pl.'s Br. at 8 (citing Acierno, 40 F.3d at 597).) "Acts that are administrative, executive, or ministerial are not considered legislative functions for immunity purposes." (See id.) "Additionally, official acts affecting the community at-large might tip the balance in favor of finding of legislative conduct, while acts directed at one or a few individuals might be dispositive of executive or administrative conduct." (See id.) This reflects a recognition of a two-part test adopted by the Acierno Court to determine whether an action is legislative in nature. In that test, the Court must consider: (1) whether the action is "substantively" legislative, "which requires that it involve policy-making or line-drawing decision," Acierno, 40 F.3d at 610, and (2) whether "the action [was] 'procedurally' legislative, which requires that it be undertaken through established legislative procedures." Id.

In Acierno, the Court of Appeals drew a careful distinction between action taken by the county council to revoke a development agreement it had already approved, and actions taken to regulate land development based upon broadly

applicable principles and public policy. In that matter, the county council voted to revoke a previously approved development plan, which had been approved nearly 20 years before, pursuant to a "sunsetting provision," which permitted revocation of development rights after the passage of ten years if the proposed facilities and infrastructure were deemed insufficient. *Acierno*, 40 F.3d at 612. The Court of Appeals held that this action constituted a regulation of existing zoning laws, and did not "facilitate enactment or amendment of new zoning laws involving broad-based policy or line-drawing determinations." *Id.* However, the county council also voted to enact an ordinance which rezoned the subject property so as to restrict its usage. *See id.* Although the county council's actions were aimed at a single parcel, the Third Circuit found that the question of whether the action was substantively legislative or administrative required an inquiry into whether the legislation affected the community as a whole and whether the legislators were acting in a policy-making manner. *Id.* at 613. In finding that the county council's rezoning of the parcel constituted legislative action, the Third Circuit explained how it arrived at its decision: "Through the normal review process, specific concerns arose such as whether the development plan complies with wetlands regulations, the fire prevention code, and public works regulations, and that the project as planned may pose serious traffic and road access problems." *Id.* The Court continued: "In response to these concerns, and ultimately, Acierno's failure to address all of them adequately in a

22

timely fashion, the County Council acted to regulate the intensity of development on this fairly large parcel of land by passing the rezoning ordinance." *Id.* In acting in this manner, the Court held that the county council's actions were "substantively legislative." *Id.*

In the present matter, the Scranton City Council considered similar issues. On September 30, 2002, a neighbor of the Phase I project, Grace Medallis, complained to the Scranton City Council concerning water run-off and pooling at the property. (*See* City Council Minutes, Sept. 30, 2002, Doc. 88-3.) In fact, Medallis initiated a separate suit in the Court of Common Pleas of Lackawanna County and succeeded in having the Court of Common Pleas of Lackawanna County issue an order prohibiting future development of the Village at Tripp Park pending the developer's compliance with several outstanding engineering issues. (*See* Opinion of Court of Common Pleas, Doc. 41-38.) The order of the Court of Common Pleas was affirmed in a later decision of the Pennsylvania Commonwealth Court. *See CIDC-1, LLC v. Medallis*, 998 A.2d 683 (Pa. Commw. Ct. 2010). Further, in her deposition testimony, then-Council President Gatelli testified that she voted to table the resolution because of complaints from the neighbors. (*See* Gatelli Deposition at 99:1-8, Doc. 88-5.) She specifically testified that she would believe her neighbors over a developer who failed to live-up to its promises to address certain matters on previous projects. (*See id.* at 99:11-12.) Councilman William Courtright similarly

23

testified at his deposition that he voted to table the resolution because of the numerous complaints lodged by neighbors. (*See* Courtright Deposition at 18:9-15, Doc. 88-7.)

Significantly, Councilwoman Evans testified at her deposition that she believed the City of Scranton was "mired in debt" (*see* Evans Deposition at 15:2-4, Doc. 88-6), and that the approval of Keystone Opportunity Zones ("KOZ") were burdening the "working men and women and the elderly and poor of the City of Scranton."[2] (Evans Deposition at 15:9-13.) Phase III was a KOZ. Taking this policy consideration into account, which affects the entire community with regard to taxes, standards of living, and business development, the Court considers such concerns to be a substantial factor in determining that the Scranton City Council was not engaged in the adjudicative enforcement of a preexisting land development ordinance, but instead exercised its authority to regulate broad, far reaching municipal policies. Voicing an opinion with regard to the extension of KOZ and KOEZ approvals, and predicating a decision as to whether a development project should be approved based upon such considerations, is a clear exercise of legislative prerogative.

---

[2] Keystone Opportunity Zones and Keystone Opportunity Expansion Zones "are geographic areas that can provide specific state and local tax benefits." *See* Pa. Dep't of Revenue Website, http://www.portal.state.pa.us/portal/server.pt/community/keystone_opportunity_zones/14522. "The goal of the KOZ/KOEZ program is to revive economically distressed urban and rural communities with one of the most powerful market-based incentives—eliminating taxes." *Id.*

It must also be noted that in *Acierno,* the county council's revocation of an already approved development plan differs substantially from the facts in this case where no plan for Phase III had ever been approved by Scranton City Council. In *Acierno,* the county council reversed itself; here, however, the Scranton City Council was not acting to revoke an agreement to which it had previously agreed or authorized. Taking these considerations into account, the Court believes that the actions of the Scranton City Council are more analogous to those taken with regard to the rezoning effort in *Acierno* as opposed to the revocation of the development plan under the sunset provision.[3]

Here, the record indicates that the Scranton City Council tabled the resolution authorizing the Development Agreement after certain items on a punch list provided to Plaintiffs were not addressed. Council President Judy Gatelli refused to vote in favor of the resolution pending the completion of the items on the punch list, and Councilwoman Evans believed that supporting the project amounted to some form of "corporate welfare." Both Councilwoman Gatelli and Councilwoman Evans are elected legislators, not board members, administrative officers, or judges. They answer to constituents and address matters of public concern. Plaintiff's complaint that Councilwoman Gatelli tabled the resolution because of friendships with residents

---

[3] The Court notes that the actions of the City Council were undertaken pursuant to standard legislative procedures in that all parties had an opportunity to raise the issues at hand in an open forum, the issues were subject to deliberation, and the motion to approve the resolution was tabled.

of Phase I does not cast doubt upon the propriety of Councilwoman Gatelli's priorities, nor does it render them illicit. According to the transcript of an April 20, 2006 Caucus Meeting, Councilwoman Gatelli stated: "[I] have a lot of friends in the City of Scranton, and I respect them, I'll take my friends over a developer any day of the week that doesn't follow the rules in the City of Scranton." (See Causus Meeting Tr. 28.) This is the language of an elected oficial expressing concern over the needs of a constituency. Plaintiff's extensive use of Councilwoman Gatelli's admission at the Caucus Meeting reveals the concern Councilwoman Gatelli had for the residents of Phase I, and demonstrates that her reservations concerning Phase III were predicated upon multiple concerns voiced to her by constituents. If anything, this belies Plaintiff's argument that Councilwoman Gatelli's actions were in some way adjudicative.

As elected officials, Scranton City Council had a responsibility to the community to ensure that certain standards were met before it would authorize the Development Agreement. The Development Ordinance, and particularly Section 10, clearly permits the Scranton City Council to require developers to meet certain threshold requirements as a precondition to their approval of a development agreement. See Development Ordinance, § 423-43(B)(1)-(11). In this matter, the Council determined they were not met.

Furthermore, the Council members' on-record comments clearly indicate that the tabling of the resolution to approve the Development Agreement affects far more than just the Plaintiff in this matter. The Development Agreement implicates the property rights of individual neighbors surrounding the Phase III project. The decision to table the resolution was a legislative action because it affected the entire community. As the Fifth Circuit held in *Jackson Court Condominiums v. City of New Orleans*, 874 F.2d 1070 (5th Cir. 1989), "where a zoning decision has been made by an elected body such as City Council," such action should generally be categorized as legislative or quasi-legislative. *Id.* at 1074.

Even if the Court considers the Scranton City Council's decision to be aimed solely at Plaintiff, this would not alter the Court's analysis. In *LC&S, Inc. v. Warren Co. Area Plan Comm'n,* 244 F.3d 601, 604 (7th Cir. 2001), Judge Richard Posner observed that "[i]t is utterly commonplace for legislation to be incited by concern over one person or organization", and further noted that "[u]nfortunately the line between legislation and adjudication is not always easy to draw, especially when the extent of the legislative domain is extremely limited, as is often the case with zoning." *Id.* at 603. In *LC&S*, the Court held that prospective regulation advanced by the Warren County Area Plan Commission, that is, the amendment of zoning regulations to restrict the use of a particular parcel from housing a gay bar or strip club was within the Commission's legislative prerogative. *See id.* at 605. The Seventh Circuit

27

recognized that the plaintiffs "were the target" of the legislation, but understood that the elected "burghers" of Williamsport found the use of the property for a gay bar or a strip club to be "anathema." *Id.* at 604. The commission's actions, directly aimed at the developers in that case, did "not establish that the amendment was not a bona fide legislative measure." *Id.* In the present matter, the tabling of the resolution to approve the Development Agreement was engendered by concern over Plaintiff's activities, but the City Council's decision affected the entire community. Distilled to its essence, even if the City Council's actions were directed at Plaintiff alone—which they were not—such actions would not intrinsically constitute administrative or executive activity.

In *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461 (7th Cir. 1988), the Court recognized that "much governmental action is protectionist or anticompetitive." *Id.* at 467. It further found that "nothing is more common in zoning disputes than selfish opposition to zoning changes." *Id.* "The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic (perhaps of any) government, operations which are permeated by pressure from special interests." *Id.* In the present matter, Plaintiff admits that Defendants were motivated, at least in part, by political pressure exerted by constituents expressing opposition to the Development Agreement. This is precisely the type of political influence that the Seventh Circuit identified as part and

parcel of the political process—actions which are not unconstitutional. The fact "'that town officials are motivated by parochial views of local interests which work against plaintiffs' plan and which may contravene state subdivision laws' (or, we add, local ordinances) does not state a claim of denial of substantive due process." *Coniston Corp.*, 844 F.2d at 467 (quoting *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982)). In the present matter, the vocalized concern of individual members of the Scranton City Council with regard to the concerns expressed by their constituents provides a rational basis upon which to support their decision to table the resolution. *See Pace Resources, Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1034-35 (3d Cir. 1987)("federal courts largely defer to legislative judgment on such matters as zoning regulation 'because of the recognition that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus necessarily produces laws that burden some groups and not others'").

With regard to *procedural* due process, which is closely bound to *substantive* due process in land use matters, the Court must ask whether the Scranton City Council's failure, if any, to follow its own procedures or policies resulted in a constitutional deprivation. "The Constitution does not require legislatures to use adjudicative-type procedures, to give reasons for their enactments, or to act 'reasonably' in the sense in which courts are required to do. . . ." *Coniston Corp.*,

29

844 F.2d at 468. Further, "legislatures can base their actions on considerations—such as the desire for a special-interest group for redistributive legislation in its favor—that would be thought improper in judicial decision-making." *Id.* A legislature is not "required to judicialize zoning, and perhaps it would not be well advised to do so." *Id.* Here, the Scranton City Council voiced concern over a project whose participants, or at least some of them, had been involved in another project bearing the same name, albeit at an earlier phase, and who did not remediate a number of land use and municipal concerns. This resulted in citizen opposition to the Phase III project. The Scranton City Council provided Plaintiff with an explanation as to the reason for such opposition even though it was not under any obligation to do so. Plaintiff was not deprived of procedural due process because the Scranton City Council's actions were legislative in nature.

## CONCLUSION

For the reasons set forth in this memorandum opinion, the Court finds that the actions of the Scranton City Council were legislative in nature and that Plaintiffs are not entitled to due process protections. This matter shall be dismissed and a separate order will issue.

DATE: May 21, 2013

Robert D. Mariani
United States District Judge